Arthur J. Straus v. Commissioner. Arthur J. Straus and Lucille E. Straus v. Commissioner.
Straus v. Commissioner
Docket Nos. 32057, 32058.
United States Tax Court
T.C. Memo 1955-336; 1955 Tax Ct. Memo LEXIS 3; 14 T.C.M. (CCH) 1328; T.C.M. (RIA) 55336; December 30, 1955
*3 A. L. Skolnik, Esq., 710 North Plankinton Avenue, Milwaukee, Wis., for the petitioners. John L. Pedrick, Esq., for the respondent. TURNER Memorandum Findings of Fact and Opinion TURNER, Judge: The respondent determined a deficiency in income tax against petitioner Arthur J. Straus in 1947 of $5,224.60, and against Arthur J. and Lucille E. Straus in 1948 of $3,306.52. The question for decision is whether salary payments received by petitioner Arthur Straus in 1947 and 1948 constituted back pay within the meaning of section 107(d) of the Internal Revenue Code of 1939. An adjustment of a medical expense deduction by respondent for 1947 is not contested. Findings of Fact Some of the facts have been stipulated and are found as stipulated. The petitioners are husband and wife and reside in Milwaukee, Wisconsin. Arthur J. Straus, sometimes referred to herein as petitioner, filed an income tax return for the calendar year 1947, and he and Lucille E. Straus filed a joint income tax return for the calendar year 1948 with the collector of internal revenue for the district of Wisconsin. Petitioner was president and general manager of Caswell Building Corporation, sometimes *4 referred to herein as Caswell, from its inception in 1925 through 1948. From 1931 to 1948 he was the record holder of not less than 480 shares of Caswell's 500 shares of outstanding stock, "except that from August 6, 1932, through November of 1947, 499 out of 500 shares were held in trust and 1 share was owned" by petitioner "during such latter period." Caswell operated two office buildings in downtown Milwaukee, one the Caswell Building and the other the Caswell Annex. Its income consisted almost entirely of rentals from these buildings. The Caswell Building, a seven-story building, and the Caswell Annex, an eight-story building are connected and are operated as a unit. They are located at the northwest corner of Plankinton and West Wisconsin Avenues. The Caswell Building faces Wisconsin Avenue, the principal thoroughfare of the city, and has 80,000 to 85,000 square feet of rentable store and office space. The Annex is on Plankinton Avenue but its entrance is through the Wisconsin Avenue entrance of the Caswell Building. It is connected with the Caswell Building proper by hallways crossing each floor except the first and has 20,000 to 25,000 square feet of rentable store and office *5 space. Caswell's interest in these buildings was that of lessee under two separate leases, one on the Caswell Building for a term expiring December 31, 1937, and one on the Caswell Annex for a term expiring August 31, 2008. To have separated the Annex from the Caswell Building an entrance from Plankinton Avenue would have had to have been built. The freight elevator in the Annex would have had to have been rehabilitated as a passenger elevator. In addition the corridors crossing between the two buildings would have had to have been closed and water lines, electric lines and heating lines adjusted. Caswell's leasehold interests in the above buildings had been mortgaged for $350,000. The mortgage was a first mortgage and at January 1, 1931, the balance due thereunder was $208,000. In February 1931, Caswell applied to the Railroad Commission of Wisconsin (now the Public Service Commission) for a permit to sell $85,000 in bonds to be secured by a second mortgage on its leasehold interests. "As a condition of procuring such permit, the company [Caswell] was obliged to and did agree that no executive salaries and no salary to its officers would be paid while any of the second mortgage *6 bonds were outstanding." An affidavit by petitioner reciting that he was president of Caswell and the owner of practically all of its outstanding capital stock, was filed in support of the application. The affidavit read in part as follows: "Deponent further states that in the income accounts of said Corporation for the year 1929 there is shown as an expense 'Salary - Officers, $10,000.00' and for the year 1930 there is shown as expense an item 'Salary - Officers, $11,000.00'; that deponent is the owner of practically all of the outstanding capital stock of Caswell Building Corporation, and that such salaries for said years have been paid to deponent; that said salaries have been discontinued, and that as a condition of the Railroad Commission of Wisconsin issuing a permit to said Corporation for the sale of its General Mortgage 6 1/2% Leasehold Gold Bonds deponent agrees that no executive salaries and no salary to officers of said Corporation will be paid while any of said General Mortgage 6 1/2% Leasehold Gold Bonds are outstanding." The permit applied for was issued to Caswell under date of May 28, 1931. For the years 1926 through 1930, and for his services as president and *7 general manager of Caswell petitioner had received compensation as follows: 1926
$ 2,700
1927
5,000
1928
7,500
1929
10,000
1930
10,000 The amount of the compensation was fixed and it was drawn in the course of the year in which the services compensated for were rendered. The minutes of the meeting of Caswell's board of directors for February 8, 1927, contained the following: "It was regularly moved and seconded that the salaries paid to the directors and officers of the corporation for the years 1925 and 1926 be hereby aproved, it being understood that said salaries are paid for duties performed by said persons other than officers of the corporation. Motion unanimously carried." Similar motions were shown as adopted by Caswell's board of directors on February 14, 1928, February 12, 1929 and February 11, 1930, with respect to compensation similarly paid for the years 1927, 1928 and 1929, respectively. Starting in 1931 Caswell's business began to feel the effects of the depression. The situation continued to deteriorate through 1932 and the low point was reached in 1933. The buildings did not have "so many" vacancies but a number of their tenants began *8 falling behind in their rent and some of them were lost. In the case of other tenants it became necessary to reduce the rent. For 1931 Caswell's net income before income taxes was $21,486.81 but beginning with 1932 and through 1939 it sustained net losses. These net losses resulted in part from losses on the sale of securities. The net losses sustained and the losses on securities for said years were as follows: Loss on
Year
Net Loss
Securities
1932
$ 581.85
1933
20,291.49
1934
50,724.89
$ 34,915.15
1935
10,254.82
1,612.50
1936
26,492.87
23,406.28
1937
13,613.52
3,601.80
1938
133,685.46
139,019.29
1939
4,547.02
16,646.30
On January 1, 1933, the balance on the outstanding principal of Caswell's first mortgage bonds was $160,000. On July 1, 1933, Caswell defaulted in the payment of interest on the said bonds and thereafter it defaulted on all interest which became due thereon to January 1, 1938. At that date there was due and unpaid interest on the said bonds in the sum of $48,000. The bonds were payable semi-annually at the rate of $16,000. Beginning with the payment due on January 1, 1933, Caswell defaulted on all principal payments *9 up to and including the payment due on July 1, 1937. The interest on the second mortgage bonds was payable quarterly and on April 1, 1933, Caswell defaulted on the interest falling due on that date. Thereafter no interest was paid on the bonds to and including the interest due on January 1, 1938. The interest due and unpaid on that date was $21,775. Caswell also defaulted on the principal payments on its outstanding second mortgage bonds beginning with the payment due on October 1, 1932. Up to and including the payment due on January 1, 1936, the payments in default were as follows: October 1, 1932
$ 1,500
January 1, 1933
3,000
April 1, 1933
3,500
July 1, 1933
4,000
October 1, 1933
3,000
January 1, 1934
4,000
April 1, 1934
4,000
July 1, 1934
4,000
January 1, 1935
4,000
April 1, 1935
3,500
July 1, 1935
4,000
October 1, 1935
4,000
January 1, 1936
20,500
Immediately after the default in principal on the first mortgage bonds the trustees under the trust indenture, Arthur J. Straus Company and Frances E. Nowak, demanded possession of the Caswell Building and the Caswell Annex. The Arthur J. Straus Company, referred to hereafter as Straus Company, *10 was a Wisconsin corporation and was engaged in the general real estate and insurance business. Petitioner was its president and owned 90 per cent of its stock. On June 8, 1933, Caswell executed an instrument delivering possession of the said buildings as demanded by the trustees and transferred, assigned and set over to them all rents, issues and profits then or which would thereafter become due and payable to Caswell as and for rentals or otherwise from the said property and premises from the then tenants and future tenants. It also transferred and assigned to the trustees its title and interest in and to all leases made by Caswell with any of its tenants. Also assigned was a claim against a defunct bank in the amount of $9,684. By said assignment Straus Company and Frances E. Nowak were appointed agents and attorneys-in-fact to collect rents, issues and profits from the buildings; to do any and all acts, matters and things necessary for the management and operation of the property and to lease all or any part of the premises upon such terms and conditions as they deemed advisable. From the money so collected the trustees were to pay all the expenses incurred in the operation of the *11 buildings, including ground rental, taxes, insurance premiums, compensation for employees and agents, attorneys' fees and costs incurred in the collection of rents and other changes and to apply any surplus in the payment of interest and other charges on the bonds and coupons secured by the first mortgage trust indenture. [1]
On June 19, 1933, an attempt was made to procure an extension of the first and second mortgages. The attempt failed due to the fact that the consent of all the bondholders thereunder could not be procured and the operation of the buildings was continued by the trustees. Early in 1937 petitioner entered into negotiations for an extension of the ground lease of the Caswell Building, which was to expire on December 31 of that year and after protracted negotiations *12 he procured an agreement from the fee owners extending the lease for a period of 30 years beginning January 1, 1938. Upon procuring the extension of the lease another plan of reorganization was proposed to the holders of the first and second mortgage bonds. At that time the first mortgage bonds outstanding were in the principal amount of $90,600 and the second mortgage bonds outstanding were in the principal amount of $67,000. The holders of the outstanding bonds accepted the plan and it became effective as of January 1, 1938. Under the plan of reorganization $22,650 was paid in cash to the holders of the outstanding first mortgage bonds and new first mortgage bonds in the principal amount of $67,950 were exchanged for the old bonds. In payment of the outstanding second mortgage bonds new second mortgage bonds were exchanged par for par. On April 8, 1938, but effective as of January 1, 1938, Caswell executed a new first trust indenture naming A. E. Francke as trustee securing the new first mortgage bonds in the principal amount of $67,950. On the same date it also executed a new second mortgage trust indenture naming Walter F. Mayer as trustee to secure the new second mortgage *13 bonds in the principal amount of $67,000. The first mortgage trust indenture contained a requirement that the corporation pay and deposit with the trustee on the first day of February each year beginning with 1939 the net earnings from the operation of the mortgaged property during the preceding calendar years. It defined the net earnings as the gross annual income collected from the operation of the mortgaged property after deduction of ground rental, taxes, operating expenses as defined in the extension of the ground lease from the Caswell estate, interest on first and second mortgage bonds, expenses of reorganization and refunding of the bond indebtedness but without deduction for amortization or depreciation. Operating expenses were to include a fee for the management of the mortgaged property of 5 per cent of gross annual income but in no event to exceed $5,000 per year. The first mortgage trust indenture also contained a provision that the net earnings deposited with the trustee be used to retire first mortgage bonds by their purchase on the open market at the lowest price obtainable or if such bonds were not available on the open market by redemption at par plus accrued interest. *14 The second mortgage trust indenture contained the requirement that after all of the outstanding first mortgage bonds had been paid or retired, the net earnings derived from the mortgaged property were to be deposited with the trustee for the purpose of paying the principal of the second mortgage bonds. Net earnings were defined as the gross annual income collected after the deduction of ground rent, taxes, operation expenses as defined in the extension of the ground lease from the Caswell estate, and interest on outstanding second mortgage bonds but without deduction for amortization or depreciation. The operating expenses were to include fees for management of the mortgaged property of 5 per cent of the gross annual income but in no event to exceed $5,000 per annum. The net earnings so deposited with the trustee were to be used to retire the second mortgage bonds by their purchase on the open market and at the lowest price obtainable of if such bonds could not be purchased on the open market by redemption thereof at par plus interest. The definition of operating expenses in the agreement for the extension of the ground lease from the Caswell estate, dated April 30, 1937, reference *15 to which was made in the trust indentures, did not include salaries to officers. It did include brokerage fees paid for securing tenants but only if the persons or corporations securing the tenants were not interested in or affiliated with Caswell or managers from time to time of its buildings. Upon the execution and delivery of the first mortgage trust indenture under the reorganization, possession of the buildings was redelivered to Caswell and the prior assignment of rents which it had executed was released. The indebtedness secured by the first mortgage trust indenture was not fully discharged until February 23, 1945, and on that day A. E. Francke, trustee, made and executed his satisfaction of the trust indenture. The indebtedness secured by the second mortgage trust indenture was not fully discharged until December 11, 1946, and on that day Raymond Scribner, successor trustee, executed his satisfaction of the trust indenture. "During the years 1931 through 1940 the petitioner, Arthur J. Straus, rendered services to the company [Caswell] consisting of carrying on negotiations with the trustees under the trust indentures, bondholders, and their representatives, to avoid *16 foreclosures of the trust indentures; carrying on negotiations with all tenants and prospective tenants for leases and procuring tenants; carrying on negotiations with the fee holders for a thirty year extension of the lease of the Caswell Building and procuring such extension; carrying on negotiations with the trustees under the trust indentures and bondholders and their representatives to effect a plan of reorganization calling for a resetting of the terms of the trust indenture and an extension for the payment of the indebtedness secured thereby; negotiating for and procuring profitable ground floor leases with financially responsible tenants; taking charge of and actively pursuing a program of rehabilitation of the buildings and improving the same to attract better classes of ground floor and office tenants; that said services resulted in general and financial benefits to the company during such period." During the years 1931 through 1940 no compensation was paid by Caswell to petitioner for the services rendered by him to it during those years. No compensation to him was accrued on the books of Caswell and no action was taken by its board of directors for the payment of compensation *17 to him. At a special meeting of Caswell's board of directors held December 29, 1947, a resolution was adopted for the payment of $10,000 to petitioner for services rendered by him to Caswell during the years 1931 to 1935, inclusive. The resolution was as follows: "RESOLVED, that Caswell Building Corporation pay to Arthur J. Straus the sum of $10,000.00 in consideration of services rendered by him for the following years: 1931
$ 2,000
1932
2,000
1933
2,000
1934
2,000
1935
2,000
Total
$10,000 and that payment of these retroactive salaries for the years above mentioned shall be paid at this time to Arthur J. Straus." Payment to petitioner of the $10,000 so voted was made by Caswell in 1947 from its current operating income. At a special meeting of Caswell's board of directors held December 30, 1948, a resolution was adopted for the payment of $10,000 to petitioner for services rendered by him to Caswell during the years 1936 through 1940, inclusive. The resolution was as follows: "RESOLVED, that Caswell Building Corporation pay to Arthur J. Straus the sum of $10,000.00 in consideration of the services rendered by him as an officer and General Manager, *18 and accepted by the company, for the following years in the amounts stated: 1936
$ 2,000
1937
2,000
1938
2,000
1939
2,000
1940
2,000
Total
$10,000 and that payment of such amount be made to him at this time." Payment to petitioner of the $10,000 so voted was made by Caswell in 1948 from its current operating income. The $10,000 so paid to petitioner by Caswell in each of the years 1947 and 1948 was in excess of 15 per cent of petitioner's gross income for each of such years. Opinion The question is whether or not the $10,000 paid by Caswell to petitioner in 1947 for services rendered during the years 1931 through 1935 and the $10,000 paid in 1948 for services rendered during the years 1936 to 1940, inclusive, was back pay within the meaning of section 107(d) of the Internal Revenue Code of 1939. [2] That petitioner rendered to Caswell the services in the years for which the compensation was so paid does not appear to be an open question since the parties have stipulated that during the years 1931 through 1940 he rendered to Caswell services consisting of "carrying on negotiations with the trustees under the trust indentures, bondholders, and their *19 representatives, to avoid foreclosure of the trust indentures; carrying on negotiations with all tenants and prospective tenants for leases and procuring tenants; carrying on negotiations with the fee holders for a thirty year extension of the lease of the Caswell Building and procuring such extension; carrying on negotiations with the trustees under the trust indentures and bondholders and their representatives to effect a plan of reorganization calling for a resetting of the terms of the trust indenture and an extension for the payment of the indebtedness secured thereby; negotiating for and procuring profitable ground floor leases with financially responsible tenants; taking charge of and actively pursuing a program of rehabilitation of the buildings and improving the same to attract better classes of ground floor and office tenants," and "that said services resulted in general and financial benefits to the company during such period." *20 And, aside from any question as to whether or not the assignment on June 8, 1933, of the leasehold interest in the Caswell Building and Caswell Annex to the trustees under the first mortgage indenture and the holding thereof by the trustees until the reorganization of Caswell in 1938 was an event similar in character to a receivership within the purview of the statute, the facts show that as a condition to the procuring of the permit issued on May 28, 1931, by the Railroad Commission of Wisconsin for the sale of second mortgage bonds, Caswell was required to and did agree that no executive salaries and no salaries to its officers would be paid so long as any of the said bonds were outstanding and that it was not until the 11th day of December 1946, that Caswell was relieved of the restriction against the payment of salaries to its officers. Such a restriction, we think, is an event such as was contemplated under (iv) of section 107(d)(2) and we so hold. Norbert J. Kenny, 4 T.C. 750. More difficult, however, is the contention of the respondent that there was no prior obligation on the part of Caswell to pay compensation to petitioner for the services rendered to it *21 for the years 1931 through 1940, and that in the absence of such prior obligation the payments do not qualify as back pay within the meaning of section 107(d). It is true that there was no formal agreement between petitioner and Caswell with respect to compensation for the services rendered by him to it. It is also true that during the period in question no salary or compensation was accrued in favor of petitioner on Caswell's books of account. It is likewise true that the affidavit of petitioner submitted by Caswell to the Wisconsin Railroad Commission did, as respondent points out, recite that salaries to officers had been discontinued. These facts, the respondent argues, require the conclusion that there was no obligation on the part of Caswell to pay petitioner for the services in question prior to the adoption of the resolutions in 1947 and 1948, and under Elsie L. Sedlack, 17 T.C. 791; Frank R. Bavis, 18 T.C. 418, affd. 202 Fed. (2d) 843, and Cowan v. Henslee, 180 Fed. (2d) 73, the decision must be in his favor. Our decision, however, must be limited to the case presented and must be made on the record before us and not on *22 what they might have been. Any argument that in doing the things done by him in managing the operation of Caswell and in working out the problems leading to and effectuating its organization petitioner was really working for Straus Company, trustee, under the mortgage indenture or for himself as an investor in Caswell is not open to respondent, since, as already noted, he has stipulated with petitioner that those services and that work were performed for Caswell. Furthermore, looking upon Caswell as an entity separate and distinct from petitioner, as on the record, we must do, we find that up to the time of the application for and the procuring of the permit from the Wisconsin Railroad Commission for the sale of the second mortgage bonds, there was a well defined and established pattern of employment of petitioner by Caswell. As services other than the mere serving as an officer were performed by petitioner during the year payment was made therefor and after the close of the year formal resolutions were adopted approving the payments which had been so made. These facts, we think, show a continuing and not a separate year to year employment. The facts also show that from the organization *23 of Caswell the compensation for the services rendered was continuously and regularly paid until application was made for the permit to sell the second mortgage bonds. The record also indicates and shows why the payments not the employment ceased, it being stipulated by petitioner and respondent herein that "As a condition of procuring such permit, the Company [Caswell] was obliged to and did agree that no executive salaries and no salary to its officers would be paid while any of the second mortgage bonds were outstanding." Such being the record, it is in our opinion reasonable to conclude that there was intended to be and was a continued employment of petitioner by Caswell but that payment for the services rendered was suspended by the conditions and requirements imposed by the Wisconsin Railroad Commission, and in the words of the statute that the compensation here "would have been paid prior to the taxable year except for the intervention" of those conditions and requirements. See and compare Langer's Estate v. Commissioner, 183 Fed. (2d) 758 and Estate of R. L. Langer, 16 T.C. 41. We accordingly conclude and hold that the $10,000 here in question received *24 by petitioner from Caswell in 1947 and the similar amount received by him in 1948 constituted back pay within the meaning of section 107(d). Decisions will be entered under Rule 50. Footnotes
1. Frances E. Nowak is not otherwise identified and there is no indication of record that he actually participated in the management of the two buildings during the time they were held by him and the Straus Company under the assignment above. The record indicates that all work done in connection with the operation and management of the buildings was by petitioner and the employees of the Straus Company.↩
2. SEC. 107. COMPENSATION FOR SERVICES RENDERED FOR A PERIOD OF THIRTY-SIX MONTHS OR MORE AND BACK PAY. * * *
(d) Back Pay. - (1) In General. - If the amount of the back pay received or accrued by an individual during the taxable year exceeds 15 per centum of the gross income of the individual for such year, the part of the tax attributable to the inclusion of such back pay in gross income for the taxable year shall not be greater than the aggregate of the increases in the taxes which would have resulted from the inclusion of the respective portions of such back pay in gross income for the taxable years to which such portions are respectively attributable, as determined under regulations prescribed by the Commissioner with the approval of the Secretary. (2) Definition of Back Pay. - For the purposes of this subsection, "back pay" means (A) remuneration, including wages, salaries, retirement pay, and other similar compensation, which is received or accrued during the taxable year by an employee for services performed prior to the taxable year for his employer and which would have been paid prior to the taxable year except for the intervention of one of the following events: (i) bankruptcy or receivership of the employer; (ii) dispute as to liability of the employer to pay such remuneration, which is determined after the commencement of court proceedings; (iii) if the employer is the United States, a State, a Territory, or any political subdivision thereof, or the District of Columbia, or any agency or instrumentality of any of the foregoing, lack of funds appropriated to pay such remuneration; or (iv) any other event determined to be similar in nature under regulations prescribed by the Commissioner with the approval of the Secretary; * * *↩